**UNITED STATES of America, Appellee,**

v.

**DEANER et al.**

**Tab Deaner, Appellant.**

**No. 92–7626.**

United States Court of Appeals,
Third Circuit.

Argued May 12, 1993.
Decided July 29, 1993.

Spero T. Lappas (argued), Harrisburg, PA, for appellant.

James J. West, U.S. Atty., William A. Behe (argued), Asst. U.S. Atty., Harrisburg, PA, for appellee.

Before: BECKER, HUTCHINSON and ROTH, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Tab R. Deaner ("Deaner") appeals an order of the United States District Court for the Middle District of Pennsylvania denying his motion to suppress evidence seized from his residence upon execution of a search warrant and the term of incarceration imposed on him by the Guidelines sentencing order the district court entered after Deaner's conditional guilty plea. We will affirm.

The district court had subject matter jurisdiction under 18 U.S.C.A. § 3231 (West 1985). This Court has appellate jurisdiction under 28 U.S.C.A. § 1291 (West Supp.1993) and 18 U.S.C.A. § 3742(a) (West 1985 & Supp.1993).

## I.

After a search of Deaner's residence revealed the indoor cultivation of marijuana, a grand jury indicted him on one count of possession of marijuana with intent to manufacture and distribute under 21 U.S.C.A. § 841(a)(1) (West 1981), and one count of conspiracy to possess marijuana with intent to manufacture and distribute under 21 U.S.C.A. § 846 (West Supp.1993) and § 841(a)(1). Deaner filed a motion to suppress the marijuana plants and horticultural equipment that were seized during the search arguing that the government's use of a forward-looking infra-red device ("FLIR") to gauge the heat emanating from his residence was a prohibited warrantless search, and that the affidavit upon which issuance of the search warrant was based did not establish probable cause. The district court ruled against Deaner on both issues in denying his motion to suppress. Deaner then entered a conditional guilty plea to the count in the indictment charging him with possession with intent to manufacture or distribute marijuana.[1]

Before he pleaded guilty, Deaner had submitted to the government a written request for discovery of physical evidence. The government concedes that the request included the marijuana plants it had seized during the physical search of Deaner's residence. See Brief for Appellee at 29. The government did not respond to the request, and defense counsel made no attempt to inspect the marijuana before Deaner entered his guilty plea.

After Deaner's conditional guilty plea, his counsel specifically asked to examine the marijuana. The government informed him that it had been destroyed because it was rotting and taking up needed space. After a sentencing hearing, the district court sentenced Deaner under the United States Sentencing Guidelines ("Guidelines") to twenty-one months incarceration, followed by two years supervised release, and a $50 special assessment. Deaner's sentence was based in part on the weight of the marijuana. He filed a timely notice of appeal.

## II.

On April 1, 1992, a magistrate judge issued a search warrant to Drug Enforcement Administration ("DEA") agents. The decision to issue the warrant was based upon an affidavit of probable cause executed by DEA Special Agent Mark Andrasi. The facts set out in the affidavit control at least one of the suppression issues Deaner raises. Therefore, we recite them in detail.

Andrasi began the affidavit by stating that he had been employed as a special agent since June 1991, during which time he had participated in numerous narcotics investigations. He went on to say that from December 1991 through March 1992, he was taking part in an investigation of indoor cultivation of cannabis. Deaner became a suspect after the DEA learned that he had made mail order purchases of 244 pounds of supplies from Wormsway Organic Indoor/Outdoor Garden Supply ("Wormsway") between May 1987 and April 1991. Andrasi related in the affidavit that he had learned "[t]hrough additional intelligence information" that Wormsway was a supplier of cultivation equipment seized in various indoor marijuana cultivation operations, and that Wormsway was an advertiser in *Hightimes Magazine,* a publication devoted to promoting the growth and use of marijuana. Appellant's Appendix ("App.") at 23. Andrasi cited a copy of an affidavit written by another DEA special agent as the source of his knowledge. That affidavit had been used to obtain a search warrant for Wormsway in October 1989. Andrasi also stated that undercover agents had discussed marijuana cultivation with Wormsway's owner and at least one of its employees "on numerous occasions," *id.* at 24, and that the agents had purchased equipment from Wormsway after telling its owner

---

1. A co-defendant, Melinda Kurtz, entered a plea of guilty to a reduced charge of simple posses-

sion. She was sentenced to probation and did not appeal.

that the purchases would be entirely used in marijuana cultivation.

Andrasi's affidavit also said that on January 24 and March 16, 1992, he "examined the household refuse" of Deaner and recovered marijuana stems and leaves mixed with soil on both occasions. *Id.* at 25. The affidavit described the marijuana retrieved on one occasion as "very fresh and green." *Id.* The search of Deaner's garbage also uncovered several halves of one gallon plastic jugs, which the affidavit explains cannabis producers often use for germination, and a Wormsway receipt for the purchase of fertilizer. Andrasi's affidavit did not precisely indicate where the garbage was located when it was seized or where it was searched.

In the affidavit Andrasi goes on to state that he reviewed UPS shipping records on March 19, 1992, and they indicated that Deaner had received five packages from Wormsway at regular intervals between April 26, 1991 and January 22, 1992, each weighing two pounds. Because he knew that marijuana growers must use a large amount of fertilizer over a long period of time, Andrasi said this regular flow of packages from Wormsway supported his belief that Deaner was cultivating marijuana.

In addition, the affidavit stated that the rear windows of Deaner's residence were boarded up and a side window was covered with opaque plastic. It explained that people cultivating marijuana indoors often cover the windows of their homes with plastic both to keep the heat resulting from cultivation inside and to prevent persons outside from seeing in. The affidavit described Deaner's house in detail, stating it is surrounded by a corral-style fence with a large metal gate protecting the driveway and a dog house located about 100 yards from the back of the residence.

The affidavit also stated that on March 31 and April 1, 1992, DEA agents conducted an aerial reconnaissance of the properties located in Deaner's neighborhood using a FLIR. The FLIR is a forward-looking infra-red device that detects heat sources and measures their relative intensity. DEA Agent Phelan testified at the suppression hearing that the FLIR is a "passive" device which detects only thermal energy that has been radiated from a particular source through the air to the point where the FLIR receives the signal. Aerial reconnaissance of Deaner's neighborhood with the FLIR did indicate his residence was emanating an inordinate amount of heat. in comparison with other residences in the area. With respect to the FLIR, Andrasi's affidavit stated that the amount of heat radiating from Deaner's premises was consistent with another positive FLIR sighting for indoor cannabis cultivation. The affidavit explained that grow lights used in cultivating marijuana produce a great intensity of heat.

Using a warrant issued in reliance on this affidavit, DEA agents, along with Alcohol, Tobacco and Firearms ("ATF") agents, the U.S. Marshal's service, and the Pennsylvania State Police, searched Deaner's residence. They found and seized about twenty marijuana plants, each approximately three feet high, equipment and other items used in growing marijuana, as well as pre-packaged harvested marijuana. The agents videotaped Deaner's residence during the search. The videotape shows the number of plants, their size, and the indoor growing operation. In addition, the DEA photographed the plants a number of times from different angles and had them weighed by an official of the Bureau of Standards, Weights and Measures, an agency in the Commonwealth of Pennsylvania's Department of Agriculture.

### III.

Deaner raises three issues on appeal. First, he argues that the magistrate erred in relying on the evidence found in his "household refuse" to establish probable cause because the affidavit did not indicate on its face that Andrasi had found and searched the refuse outside the curtilage of Deaner's residence. Deaner's second argument is that the DEA had to get a search warrant before it could constitutionally use the FLIR to monitor the heat emanating from his residence. In short, Deaner contends that the use of a FLIR to monitor heat emanation is a search within the meaning of the Fourth Amendment's prohibition against unreasonable

searches and seizures and therefore requires a warrant. Finally, Deaner contends that the district court erred in using the government's evidence of the marijuana's weight to calculate his Guidelines sentence because the government's destruction of the marijuana after he asked to inspect it was fundamentally unfair.

 This Court's review of the legal questions involved in the denial of a suppression motion is plenary, but "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). Instead, the standard for review of a determination of probable cause is whether the issuing authority, in this case a magistrate judge, had a substantial basis for concluding a search would uncover evidence of wrongdoing. *Id.* Reviewing courts must defer to determinations of probable cause made by the judicial officer who issued the warrant if, based on the whole affidavit, there is a reasonable common sense likelihood that the search will uncover evidence of criminal acts. The *Gates* standard is often referred to as a totality of the circumstances test. *Id.*

This Court's examination of Deaner's sentence to determine whether it was imposed in violation of law or as a result of an incorrect application of the Guidelines involves issues of law subject to plenary review. *See* 18 U.S.C.A. § 3742(a)(1), (2); *United States v. Georgiadis*, 933 F.2d 1219, 1222 (3d Cir. 1991).

### IV.

We discuss first the suppression issues, beginning our analysis with the search of the garbage.

### A.

Deaner argues that the affidavit did not show that the garbage was constitutionally seized and therefore the magistrate judge could not rely on the marijuana or other evidence found in the garbage to establish probable cause. The United States Supreme Court held in *California v. Greenwood*, 486 U.S. 35, 40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988), that a warrantless search and seizure of garbage left for collection outside the curtilage of a home does not violate the Fourth Amendment. In so holding, the Court reasoned that when "refuse [is placed] at the curb for the express purpose of conveying it to a third party, the trash collector ... might himself have sorted through respondents' trash or permitted others, such as the police, to do so" and therefore the persons who produced it have "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection." *Id.* *Greenwood* does, however, require the government to show that the garbage it inspected was readily accessible to the public. *See United States v. Hedrick*, 922 F.2d 396, 398 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991).

Andrasi's affidavit stated,

On two separate occasions, once on January 24, 1992 and again on March 16, 1992, your affiant examined the household refuse of Tab R. DEANER. On both occasions your affiant recovered stems and leaves of marijuana mixed with soil and on one occasion the recovered marijuana was very fresh and green. The marijuana was field tested by your affiant with positive results for the presence of cannabis.

The examination of the household refuse also produced a receipt dated January 17, 1992 from Wormsway for the purchase of fertilizer. Several halves of one gallon plastic jugs were also observed in the refuse. Discussions with the Harrisburg Resident Office Marijuana Coordinator concluded that plastic jugs are often used as germination containers by cannabis producers.

App. at 25. The affidavit did not state where the garbage was found, where it was searched, or who seized it.

 While the better practice might have been to include in the affidavit a statement on the location of the garbage at the time it was seized, the absence of an express specification of this location is not fatal. The natural implication of the defendant's argument is that every piece of evidence relied on

by an affiant must be shown to have been acquired constitutionally. This would constitute a substantial burden on affiants, as imaginative defense counsel will often successfully be able to argue that the failure to disprove some hypothetical set of facts left it ambiguous as to whether the facts contained within the four-corners of the affidavit established that the evidence was seized in a constitutional manner.

More importantly, accepting the defendant's argument that the facts recited in an affidavit must establish that the particular evidence was seized in a constitutional manner would subject probable cause determinations to a hyper-technical analysis insupportable under governing case law. As explained by the Supreme Court in *Illinois v. Gates:* " 'Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.' " *Gates,* 462 U.S. at 235, 103 S.Ct. at 2330–31. This, and other concerns, led the Court to abandon the two-pronged test of *Aguilar* and *Spinelli* and adopt in its place the "totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations." *Id.* at 238, 103 S.Ct. at 2332. As the Court explained, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

If a defendant has a substantial basis upon which to question whether this implicit representation is true, then he or she may be entitled to a hearing on the veracity of the implicit representation that the evidence was obtained in a constitutional manner. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). In the present case, however, Deaner has not even suggested that the implicit statement as to the constitutionality of the search was false. In fact, not only has he not made that argument, he specifically declined the government's offer to have Andrasi testify as to how the garbage was obtained. Accordingly, we conclude that the magistrate could rely on the evidence discovered during Andrasi's

search of Deaner's household, refuse in deciding that there was probable cause to issue a warrant to search Deaner's residence. .

### B. .

■ Other information in the affidavit indicated that the rear windows of Deaner's house were boarded up and a side window was covered with opaque plastic, a technique Andrasi stated marijuana growers used both to prevent heat from escaping and to shield their illegal crop from external view. The affidavit also described the shipment of 244 pounds of merchandise from Wormsway, a known supplier of marijuana cultivation equipment, and five two-pound packages from Wormsway consistent with the ever present need of marijuana growers for fertilizer. The affidavit noted that Deaner's residence was surrounded by a corral-style fence with a doghouse in the backyard, again consistent with a desire to keep persons from venturing too close to the house because of Deaner's illegal activity of growing marijuana there. This information, coupled with the evidence Andrasi retrieved from Deaner's household garbage, established probable cause for issuing the search warrant.

Because the affidavit establishes probable cause without the evidence obtained by such device, we express no opinion on whether the use of a FLIR device in aerial surveillance of a residence is a search within the meaning of the Fourth Amendment. *See United States v. Herrold,* 962 F.2d 1131, 1138 (3d Cir.) (even assuming some factual averments in affidavit are tainted, they do not vitiate warrant otherwise validly issued upon other information in affidavit that establishes probable cause) (quoting *United States v. Johnson,* 690 F.2d 60, 63 (3d Cir.1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983)), *cert. denied,* —— U.S. ——, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992).

### V.

Our decision to affirm the order denying Deaner's motion to suppress requires us to consider his sentencing issue. Section 2D1.1 of the Sentencing Guidelines provides that the base offense level of a defendant convicted of manufacturing and conspiring to manu-

facture scheduled drugs varies directly with the quantity of drugs the sentencing judge finds the defendant manufactured or conspired to manufacture. *United States v. Touby*, 909 F.2d 759, 772 (3d Cir.1990), *aff'd on other grounds*, —— U.S. ——, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Specifically, section 2D1.1(a)(3) instructs us to determine the offense level by reference to the Drug Quantity Table set forth in section 2D1.1(c). *See* United States Sentencing Commission, *Guidelines Manual,* §§ 2D.1.1(a)(3), 2D1.1(c) (Nov.1992).

Deaner argues that the district court should have sentenced him for possession of marijuana with intent to manufacture and distribute without considering the marijuana's weight because the government denied him an opportunity to inspect or weigh the marijuana plants by destroying them in the face of his outstanding discovery request. If the government's evidence on the marijuana's weight cannot be considered, Deaner's base offense level would be six. After the two point reduction for acceptance of responsibility under Guideline section 3E1.1 the district court granted him, his total offense level would be four. Because Deaner falls within Criminal History Category I, an offense level of four would result in a Guideline sentencing range of zero to six months. Under section 2D1.1(c), however, the base offense level for unlawful possession of 23.9 kilograms of marijuana is eighteen. Deaner's sentence was reduced two levels for acceptance of responsibility, leaving a total offense level of sixteen. This net offense level gives a Guideline range of twenty-one to twenty-seven months imprisonment.[2] Using an offense level of sixteen, the district court sentenced Deaner to twenty-one months in prison, followed by two years supervised release, and a $50 special assessment.

The following sequence of events is central to Deaner's argument:

—Deaner was arrested on April 2, 1992.

—On May 20, Deaner sent the government a discovery request, including a request for discovery of all "tangible objects."

—Deaner filed his suppression motion on June 10.

—On July 2, without notice to either Deaner or the court, the U.S. Attorney's Office authorized the DEA to destroy the marijuana.

—On July 7, without notice to either Deaner or the court, the government destroyed the marijuana.

—On August 3, Deaner entered his guilty plea.

—At some time after pleading guilty, Deaner specifically requested access to the marijuana in order to inspect it and was told that it had been destroyed.

—On November 2, Deaner was sentenced.

■■■ At sentencing, the government presented a certificate from the Bureau of Standards, Weights and Measures of the Commonwealth of Pennsylvania, Department of Agriculture. It stated that the scale used to weigh the marijuana plants was acceptable and certified for accuracy. Neal Cashman, Jr., Director of the Bureau of Standards, Weights and Measures, certified that the marijuana plants weighed 23.9 kilograms. On the evidence, the district court calculated Deaner's sentence to reflect the weight of the marijuana under section 2D1.1.

Preliminarily, we consider the reliability of the evidence the government produced to show the weight of the marijuana. In that connection, we note that the sentencing phase of a criminal proceeding is distinct from the adjudicatory phase. While "[t]ribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations," *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949) (footnote omitted), courts imposing sentence are "free to consider a wide range of relevant material."

---

**2.** In addition to these two possible Guideline sentencing ranges, a third possibility exists. Under the Drug Quantity Table set forth in section 2D1.1(c), the weight of whole plants may be estimated. Here, because there were less than fifty plants, each plant would be deemed to be the equivalent of 100 grams of marijuana. Applying this calculation to the twenty marijuana plants seized from Deaner's residence would result in a base offense level of ten, which the two-level reduction for acceptance of responsibility would further reduce to eight. This net offense level would give Deaner a Guideline sentencing range of zero to six months incarceration.

*Payne v. Tennessee,* —— U.S. ——, ——, 111 S.Ct. 2597, 2606, 115 L.Ed.2d 720 (1991); *accord Dawson v. Delaware,* —— U.S. ——, ——, 112 S.Ct. 1093, 1097, 117 L.Ed.2d 309 (1992). The Federal Rules of Evidence and the Sentencing Guidelines reflect this practice. *See* Fed.R.Evid. 1101(d)(3) (rules of evidence not applicable at sentencing); U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."); U.S.S.G. § 6A1.3(a), p.s. ("In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); *see also United States v. Sciarrino,* 884 F.2d 95, 97 (3d Cir.) (hearsay admissible at sentencing hearing to determine amount of marijuana involved in offense as long as sufficient indicia of reliability), *cert. denied,* 493 U.S. 997, 110 S.Ct. 553, 107 L.Ed.2d 549 (1989).

Under these principles, the evidence the government produced passes the reliability test. We first note that Deaner gets no benefit from Federal Rule of Criminal Procedure 16. It specifically provides:

> Upon request of the defendant the government *shall* permit the defendant to inspect and copy or photograph books, papers, documents, photographs, *tangible objects,* buildings or places, ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or *were obtained from or belong to the defendant.*

Fed.R.Crim.P. 16(a)(1)(C) (emphasis added). Rule 16 governs only pretrial discovery. *See United States v. Nobles,* 422 U.S. 225, 235, 95 S.Ct. 2160, 2168–69, 45 L.Ed.2d 141 (1975). Although Deaner made a general discovery request for "all tangible objects" before pleading guilty, he did not specifically ask to inspect the marijuana or make arrangements for such inspection until after he had entered his plea. Thus, Rule 16 has no application.

■ Deaner's argument, however, goes beyond reliability and attempts to raise a problem of fundamental fairness implicating constitutional concerns that are rooted in due process. Indeed, as we said in *United States v. Rosa,* 891 F.2d 1074, 1079 (3d Cir.1989), "We believe the sentence imposed on a defendant is the most critical stage of criminal proceedings, and is, in effect, the 'bottom-line' for the defendant, particularly where the defendant has pled guilty." [3]

Resolution of the effect the destruction of the marijuana plants had on their use as evidence at Deaner's sentencing hearing seems to us to involve "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). Deaner made only a general discovery request for "all tangible objects." The government concedes this included the marijuana the DEA had seized from his residence. Nevertheless, there is no reason to believe that Deaner's scales would have shown a weight more favorable to him than those of the state's Bureau of Weights and Measures. We think the destruction of drugs whose weight is material to sentencing is analogous to the prosecution's failure "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *e.g., California v. Trombetta,* 467 U.S. 479, 491, 104 S.Ct. 2528, 2535, 81

---

3. *Rosa* is a pre-Guidelines case. There we held that the Jencks Act, which requires the government to provide a defendant with its witnesses' statements, upon request, after a witness has testified on direct examination at trial, applies in sentencing proceedings. *See* 891 F.2d at 1078–

79. Nevertheless, hearsay is admissible at sentencing so long as it is "reliable." *See Sciarrino,* 884 F.2d at 97; *see also United States v. Miele,* 989 F.2d 659, 663–64 (3d Cir.1993) (further elaborating on applicable standard of reliability).

L.Ed.2d 413 (1984) (failure to preserve breath samples of suspected drunk drivers used in breath-analysis tests); *Valenzuela–Bernal*, 458 U.S. at 872, 102 S.Ct. at 3449 (deportation of two witnesses who were illegal aliens).

■ A defendant who claims destroyed evidence might have proved exculpatory if it could have been subjected to tests has to show the prosecution's bad faith in ordering or permitting its destruction. Without a showing of bad faith, failure to preserve evidence that might be of use to a criminal defendant after testing is not a denial of due process. *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337–38; *see Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533–34 (citing *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308–09, 7 L.Ed.2d 256 (1961)). With respect to reliable evidence concerning an attribute of physical evidence material to a defendant's sentence, which the government has destroyed, application of the bad faith standard is, we believe, appropriate in deciding whether such evidence is admissible in a Guideline sentencing proceeding.

■ Deaner does not expressly argue bad faith on the part of the government, but he does contend that the government did not follow the procedure for destruction of the marijuana set out at 28 C.F.R. § 50.21 (1992). We have previously held that destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence. *See, e.g., Griffin v. Spratt*, 969 F.2d 16, 21 (3d Cir.1992); *United States v. Boyd*, 961 F.2d 434, 437 (3d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 233, 121 L.Ed.2d 168 (1992); *United States v. Stevens*, 935 F.2d 1380, 1388 (3d Cir.1991). While a showing that the government did not follow standard procedure could provide some evidence of bad faith, we have not held that an improper procedure in and of itself implies bad faith. While it may permit such an inference, it does not syllogistically imply the presence of bad faith as a matter of deductive logic. We address Deaner's allegations that the government failed to follow the procedure set forth in 20 C.F.R. § 50.21 for the destruction of contraband

drug substances with these principles in mind.

Section 50.21 instructs an agency having custody of contraband drugs seized pursuant to a criminal investigation "[i]mmediately [to] notify the appropriate United States Attorney . . . that the amount of seized contraband drug exceeding the threshold amount and its packaging, will be destroyed after sixty days from the date notice is provided of the seizures, unless the agency providing notice is requested in writing by the authority receiving notice not to destroy the excess contraband drug." 20 C.F.R. § 50.21(e)(1). Deaner asserts that the DEA did not notify the U.S. Attorney's Office immediately after the seizure that the marijuana would be destroyed, *see* Brief for Appellant at 27, but he does not point to anything in the record supporting that statement and we have not found anything there that would do so. The government, to the contrary, represented at the sentencing hearing that it did receive an oral request from a DEA agent for permission to destroy the marijuana "because a substantial period of time had gone by[, i]t was incredibly bulky[, and i]t was starting to rot." App. at 164. We think the district court was justified in relying on the government's statement and rejecting Deaner's unsupported assertion.

Deaner also argues that the DEA did not wait sixty days from the date on which notice of destruction was given before destroying the marijuana. Instead, he asserts that the marijuana was destroyed only five days later. Brief for Appellant at 27–28. The record does not clearly show just when the DEA asked for permission to destroy it. The subsection of section 50.21 on which Deaner relies, however, provides that destruction can take place sixty days after the date notice of the *seizure* is provided, not sixty days after DEA gives the prosecution notice of its intent to destroy the seized material. *See* 28 C.F.R. § 50.21(e)(1). Here the seizure occurred in April and the marijuana was destroyed in July. Thus, between seizure and destruction, more than the sixty days the regulation requires had passed.

Finally, section 50.21(e)(4) provides that "a representative sample" of marijuana "shall

be retained." 28 C.F.R. § 50.21(e)(4). It is undisputed that this was not done in the present case. The district court nevertheless decided that the evidence indicating that the marijuana weighed 23.9 kilograms was "more than sufficient for the purpose of sentencing as corroborated by the photographs of the plants ..., by the certificate with respect to the scale that was used, and ... from the laboratory report that that was the weight found." App. at 174. The court concluded that although the regulations were "not precisely followed by not maintaining a [representative marijuana] sample, it really does not prejudice the defendant in this situation." *Id.*

The fact that the government did not retain a representative sample does not affect the conclusion that the DEA complied substantially with the procedure set forth in section 50.21 for destruction of contraband evidence. Deaner does not challenge the government's explanation that the marijuana was destroyed because it was deteriorating and taking up limited space. At most, the government was negligent in failing to preserve a representative sample. *See Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337–38 (failure of police to refrigerate clothing and perform tests on semen samples was at worst negligent). Deaner proffers no other evidence that would preclude admission of otherwise reliable evidence on the weight of the marijuana seized from his home. We therefore conclude that this record does not show bad faith on the part of the government.

Considering the reliability of the procedures the government used in determining the weight of the marijuana, the possibility that it was something different from what the government has represented is slim. *See Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534 (preservation of breath samples probably not exculpatory because accuracy of Intoxilyzer machine had been certified). As the government points out, Deaner does not argue that the weight of the marijuana stated by the government at sentencing was incorrect, and he does not otherwise contest certification of its weight by the Director of the Pennsylvania Bureau of Standards, Weights and Measures. Therefore, we believe that the certification provided a reasonable substitute for

the actual marijuana. Under all the present circumstances, the evidence produced on the marijuana's weight had indicia of reliability sufficient to meet the requirement of fundamental fairness that is at the core of due process.

Nevertheless, we take this opportunity to caution the government against routine destruction of evidence material to sentencing. In other circumstances the government's contentions about the evidence's characteristics may be expressly denied, or may lack the strong indicia of reliability present here. In such cases, destruction of physical evidence material to sentence that the defendant has sought to discover, without giving him notice and an opportunity to inspect the evidence before it is destroyed, could be detrimental to the government. Though the failure to preserve the marijuana, standing alone, is here insufficient to show bad faith, we think it would be wise for the government to notify a defendant who has an outstanding discovery request of its intentions before it destroys evidence material to the defendant's sentence. We also think that it would be a simple matter for United States Attorneys to adopt a policy of giving defendants who have sought discovery of tangible evidence express notice, when practicable, of its impending destruction in sufficient time to permit inspection. That practice could avoid problems in cases in which the tangible evidence's material characteristics are denied or the government's proof of them lacks the indicia of reliability present in Deaner's case.

The official certification of the marijuana's weight constitutes reliable evidence from which the district court could determine the weight of the marijuana. That evidence is not directly attacked and the weight it shows is likewise not directly contested. There is no evidence of bad faith. Thus, on the facts of this case, we believe that no due process violation occurred. The marijuana's destruction did not violate Deaner's constitutional right to the fundamental fairness due process guarantees in every aspect of a criminal proceeding. *See Boyd*, 961 F.2d at 436–37. For these reasons, the district court did not err in relying on the government's evidence of the marijuana's weight to compute Deaner's base offense level under section 2D1.1 of the Sentencing Guidelines.

### VI. *Conclusion*

A common-sense reading of the affidavit supports an inference that the garbage was not within the curtilage of Deaner's residence when it was searched. Therefore, the magistrate properly relied on the information the Government swore it had obtained from the garbage in issuing the search warrant. The evidence retrieved from Deaner's household refuse, coupled with the other information detailed in the warrant, establishes probable cause upon which the magistrate properly issued the search warrant, without regard to the FLIR. Therefore, we do not reach or decide the issue whether use of the FLIR was a prohibited warrantless search. Finally, the district court did not err in computing Deaner's sentence in reliance on evidence that reliably showed the marijuana seized from his residence weighed 23.9 kilograms. We will accordingly affirm Deaner's conviction and sentence.