**16-1335-cv**
*Friedman v. Bloomberg L.P.*, **et al.**

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2016

ARGUED: OCTOBER 31, 2016
DECIDED: SEPTEMBER 12, 2017
AMENDED: MARCH 1, 2018

No. 16-1335-cv

DAN FRIEDMAN,
*Plaintiff-Appellant*

*v.*

BLOOMBERG L.P., CHRISTOPHER DOLMETSCH, ERIK LARSEN, MICHAEL HYTHA, ANDREW DUNN, MILLTOWN PARTNERS, PATRICK HARVERSEN, D.J. COLLINS, OLIVER RICKMAN, PALLADYNE INTERNATIONAL ASSET MANAGEMENT B.V., ISMAEL ABUDHER, LILY YEO,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the District of Connecticut.
No. 15 Civ. 43 – Alvin W. Thompson, *Judge*.

————

Before: WALKER, HALL, and CHIN, *Circuit Judges*.

————

Plaintiff-appellant Dan Friedman appeals from a decision of the United States District Court for the District of Connecticut (Alvin W. Thompson, *J.*) dismissing his defamation action and entering judgment in favor of the defendants-appellees.  At issue in this case is whether Connecticut General Statute § 52-59b—which provides for long-arm jurisdiction over certain out-of-state defendants except in defamation actions—violates Friedman's First or Fourteenth Amendment rights.  We conclude that it does not and AFFIRM the district court's dismissal of this action as to the out-of-state defendants.  We also consider whether the allegedly defamatory statements at issue in this case, which were reported and published by the remaining defendants, are privileged under New York Civil Rights Law § 74 as a fair and true report of judicial proceedings or are protected expressions of opinion.  We AFFIRM in part and REVERSE in part the district court's determinations regarding these statements and REMAND this action for proceedings against the remaining defendants consistent with this opinion.

_____

ALAN H. KAUFMAN, Kaufman PLLC, New York, NY (Stephen G. Grygiel, Silverman, Thompson, Slutkin & White, LLC, Baltimore, MD, *on the brief*) *for Plaintiff-Appellant*.

SHARON L. SCHNEIER (Yonatan S. Berkovits, *on the brief*), Davis Wright Tremaine LLP, New York, NY, *for Defendants-Appellees Bloomberg L.P., Christopher Dolmetsch, Erik Larsen, Michael Hytha, and Andrew Dunn*.

DEREK J.T. ADLER, Hughes Hubbard & Reed LLP, New York, NY, *for Defendants-Appellees Palladyne International Asset Management B.V., Ismael Abudher, Lily Yeo, Milltown Partners LLP, Patrick Haverson, David-John Collins and Oliver Rickman*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-appellant Dan Friedman appeals from a decision of the United States District Court for the District of Connecticut (Alvin W. Thompson, *J.*) dismissing his defamation action and entering judgment in favor of the defendants-appellees. At issue in this case is whether Connecticut General Statute § 52-59b—which provides for long-arm jurisdiction over certain out-of-state defendants except in defamation actions—violates Friedman's First or Fourteenth Amendment rights. We conclude that it does not and AFFIRM the district court's dismissal of this action as to the out-of-state

defendants.   We also consider whether the allegedly defamatory statements at issue in this case, which were reported and published by the remaining defendants, are privileged under New York Civil Rights Law § 74 as a fair and true report of judicial proceedings or are protected expressions of opinion.  We AFFIRM in part and REVERSE in part the district court's determinations regarding these statements and REMAND this action for proceedings against the remaining defendants consistent with this opinion.[1]

## BACKGROUND

This defamation action arises out of a news article published by Bloomberg News that reported on a lawsuit Friedman filed against his former employer, Palladyne International Asset Management, and others.   Friedman alleged in the lawsuit that Palladyne, a purported hedge fund based in the Netherlands, fraudulently induced him into working as its "head of risk" in order to create the

---

[1] After our initial disposition of this appeal, *see Friedman v. Bloomberg L.P.*, 871 F.3d 185 (2d Cir. 2017), defendants-appellees filed a petition for panel rehearing.  We hereby GRANT the petition without the need for reargument, *see* Fed. R. App. P. 40(a)(4)(A), withdraw our opinion of September 12, 2017, and issue this amended opinion in its place.  We also DENY as moot, pursuant to Fed. R. App. P. 29(b)(2), amici's motion to file a brief in support of rehearing.

appearance that it was a legitimate company. Friedman claimed that, over the course of nearly eight months, Palladyne and an executive recruiting firm made numerous misrepresentations to persuade him to accept this position, including that Palladyne was "a diversified investment company" with a "worldwide clientele" and "consistent, optimized returns." App'x at 15, 49, 61.

In November 2011, Friedman moved to the Netherlands and began working for Palladyne. According to Friedman, he soon discovered that Palladyne was a "kickback and money laundering operation for the former dictatorial Ghaddafi [*sic*] regime in Libya," App'x at 39, and that Palladyne's primary purpose was to channel funds at the behest of the then-head of Libya's state-run National Oil Company, who was the father-in-law of Palladyne's chief executive officer. Friedman also learned that the United States Department of Justice and the Securities and Exchange Commission were conducting investigations that implicated Palladyne. In February 2012, after Friedman voiced concerns to a colleague that Palladyne was not engaging in legitimate investment activities and could face criminal

exposure, he was "abruptly terminated with no legally cognizable explanation." App'x at 75.

On March 25, 2014, Friedman sued Palladyne and the firm that had recruited him for the position, as well as several of their employees. Friedman asserted seven counts in his complaint, including fraudulent inducement, and sought monetary damages totaling $499,401,000, plus interest, attorneys' fees and costs. He also sought, as additional punitive damages, two years of the employee defendants' salaries and bonuses. Friedman requested that "this Court enter judgment on all Counts for the plaintiff." App'x at 88.

On March 27, 2014, Bloomberg L.P. published online the article at issue in this case. Entitled "Palladyne Accused in Suit of Laundering Money for Qaddafi," the article reported on Friedman's lawsuit. Friedman responded to this article by filing the instant defamation action against (1) Bloomberg L.P. and the authors and editors of the article (collectively, the "Bloomberg Defendants"); (2) the Netherlands-based Palladyne and two of its senior officers (collectively, the "Palladyne Defendants"); and (3) Milltown Partners,

LLP—a public relations company based in the United Kingdom that worked for Palladyne and allegedly was a source of information for the article—and several of its employees (collectively, the "Milltown Defendants").

Friedman alleged that the following statements in the article were false and caused him serious and irreparable harm:

(1) A statement that "[Palladyne] was sued in the U.S. for as much as $500 million."

(2) A quote from Palladyne that "[t]hese entirely untrue and ludicrous allegations [in Friedman's earlier lawsuit] have been made by a former employee who has repeatedly tried to extort money from the company. . . . He worked with us for just two months before being dismissed for gross misconduct."

App'x at 19, 37-38. Friedman further alleged that the Bloomberg Defendants negligently published these statements without contacting him for a response or otherwise verifying their accuracy, and acted with reckless disregard by failing to correct or retract the

statements even after his lawyer alerted several of the Bloomberg Defendants to their inaccuracy.[2]

The Milltown and Palladyne Defendants moved to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. In granting the motion, the district court concluded that Conn. Gen. Stat. § 52-59b, which provides for jurisdiction over non-resident individuals, foreign partnerships, and foreign voluntary associations except in defamation cases, deprived it of personal jurisdiction over the Milltown and Palladyne Defendants, all of which are foreign entities. The district court further determined that even if Palladyne—organized under the laws of the Netherlands as a *besloten vennootschap*—were categorized as a corporation and not a foreign partnership, Conn. Gen. Stat. § 33-929 would deprive it of personal jurisdiction over Palladyne.

---

[2] There is an updated version of this article in the parties' joint appendix that includes a response from Friedman's lawyer. Because Friedman does not mention this version or attach it to his complaint, we do not consider it for purposes of this appeal.

The Bloomberg Defendants also filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim, which the district court granted. The district court held that the statement that Friedman had sued Palladyne for "as much as $500 million" was protected by N.Y. Civ. Rights Law § 74 because it was a fair and true report of Friedman's complaint and that the statement that Friedman "has repeatedly tried to extort money from [Palladyne]," while not covered by the same privilege, was a protected expression of opinion. Friedman timely appealed the dismissal of his complaint.

**DISCUSSION**

Friedman argues on appeal *inter alia* that (1) the district court has personal jurisdiction over the individual Milltown and Palladyne Defendants pursuant to Conn. Gen. Stat. § 52-59b because the statute's exclusion of defamation actions is unconstitutional[3]; (2) the "for as much as $500 million" statement is defamatory because it fails to clarify that he could not have been awarded this amount even if his

---

[3] Friedman also asserts that the lower court had jurisdiction over the corporate defendants under Conn. Gen. Stat. § 33-929. However, he fails to raise any arguments on this point and, therefore, we do not address the district court's determination to the contrary.

lawsuit were successful; and (3) the "repeatedly tried to extort money" statement suggests that he engaged in criminal conduct and implies undisclosed facts that are detrimental to his character.

**I.      Connecticut General Statute § 52-59b**

We review *de novo* an appeal from a district court's dismissal for lack of personal jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The plaintiff bears the burden of demonstrating that the court has personal jurisdiction over each defendant. *Id.* In determining whether such jurisdiction exists, a court "must look first to the long-arm statute of the forum state. . . . If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process." *Id.* at 208 (citation omitted). The relevant long-arm statute, Conn. Gen. Stat. § 52-59b(a), provides:

> [A] court may exercise personal jurisdiction over any nonresident individual, foreign partnership or foreign voluntary association . . . who in person or through an agent . . . (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person . . . within the state, except

as to a cause of action for defamation of character arising from the act.[4]

Based on the plain language of Conn. Gen. Stat. § 52-59b, the district court did not have personal jurisdiction in this defamation action over the individual Milltown and Palladyne Defendants, who are not Connecticut residents.  Friedman argues, however, that the long-arm statute's exclusion of out-of-state defendants in defamation actions violates his First Amendment right to petition and Fourteenth Amendment right to equal protection.  We disagree.

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  U.S. CONST. amend. I.  The right to petition, which applies to the states through the Fourteenth Amendment, "extends to all departments of the Government, including the courts." *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation and internal quotation marks omitted).  A plaintiff's "constitutional right of access to the

[4] Section 52-59b(a)(1) provides jurisdiction over certain out-of-state defendants who "[t]ransact[] any business within the state." Friedman did not appeal the district court's decision that this provision does not apply.

courts is violated where government officials obstruct legitimate efforts to seek judicial redress." *Id.* (citation and brackets omitted); *see also Christopher v. Harbury*, 536 U.S. 403, 413 (2002) (noting right-of-access concerns are implicated when "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time"); *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (requiring prison authorities to provide inmates with adequate law libraries or legal assistance to permit meaningful litigation of appeals).

A plaintiff's right of access to courts is not violated when, as here, a state's long-arm statute does not provide for jurisdiction over certain out-of-state defendants. Indeed, "[t]here is nothing to compel a state to exercise jurisdiction over a foreign [defendant] unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 626 (2d Cir. 2016) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222 (2d Cir. 1963) (en banc)). In *International Shoe Co. v. Washington*, the Supreme Court held that, under the Due Process Clause of the Fourteenth Amendment, state

courts could exercise jurisdiction over out-of-state defendants if the defendants had "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The Supreme Court described the extent to which it would be constitutionally permissible for state courts to exercise jurisdiction over these defendants; it did not hold that state courts were required to exercise such jurisdiction. *See id.* Relying on this principle, state legislatures enacted long-arm statutes setting forth the terms under which their courts could exercise jurisdiction over out-of-state defendants. *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, § 15.1.2A (5th ed. 2017). Although many states' long-arm statutes provide for jurisdiction that is coextensive with the limits of the Due Process Clause, some do not permit the exercise of jurisdiction to the full extent allowed by the federal Constitution. *Id.; see Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244-45 (2d Cir. 2007).

The Connecticut long-arm statute at issue here, which precludes its courts from exercising jurisdiction over certain foreign defendants in defamation actions,[5] does not provide for jurisdiction to the limits of due process. *See* Conn. Gen. Stat. § 52-59b; *see also International Shoe,* 326 U.S. at 316. The statute's limitation does not, however, violate Friedman's First Amendment right of access to courts. As we have noted, "[t]here is nothing to compel a state to exercise jurisdiction over a foreign [defendant] unless it chooses to do so," *Brown*, 814 F.3d at 626, and Friedman does not have any right to assert a claim against a foreign entity in the absence of a long-arm statute that provides jurisdiction over such an entity. *See Whitaker*, 261 F.3d at 208; *see also George v. Strick Corp.*, 496 F.2d 10, 12 (10th Cir. 1974) ("[P]ertinent federal cases do not compel state courts to open their doors to every suit which meets the minimum contacts requirements of the due process clause of the federal constitution."); *Jennings v. McCall Corp.*, 320 F.2d 64, 68 (8th Cir. 1963) ("[A] state court is free to

---

[5] We note that Conn. Gen. Stat. § 52-59b(a)(1) does permit jurisdiction over out-of-state defendants in defamation actions if the defendant "[t]ransacts any business within the state."

choose for itself the standards to be applied in determining the circumstances under which a foreign [entity] would be amenable to suit, assuming of course that minimum due process requirements are met. . . . [It is] a state's privilege to impose its own jurisdictional limitations."). Friedman, therefore, has failed to show that this statute violates his First Amendment right of access to courts.[6]

Conn. Gen. Stat. § 52-59b also does not violate Friedman's equal protection rights under the Fourteenth Amendment. Friedman argues that, applying strict scrutiny, the statute violates the Equal Protection Clause by "restricting the rights of defamation plaintiffs as a class without utilizing the least restrictive means." Appellant's Br. at 44-45. However, we apply strict scrutiny only when the challenged statute either (1) burdens a fundamental right or (2) targets a suspect

---

[6] Friedman also states, without explanation, that the long-arm statute's exception for out-of-state defendants in defamation actions violates his due process rights. Federal due process, however, does not compel a state to provide for jurisdiction over out-of-state defendants. *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 440 (1952) ("The suggestion that federal due process compels the State to open its courts to such a case [against a foreign defendant] has no substance."). Instead, the Due Process Clause *limits* the extent to which a state court may exercise jurisdiction over such defendants. *See International Shoe*, 326 U.S. at 316.

class. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). Friedman has not shown that his claim falls within either category. As we have discussed, a state is not required to extend its courts' jurisdiction over specific foreign defendants and, in the absence of a long-arm statute providing for such jurisdiction, a plaintiff does not have a fundamental right to bring an action against those foreign defendants. Further, Friedman does not argue that state residents defamed by out-of-state entities are a suspect class.

Under rational basis review, which is applicable here, "we are required to defer to the legislative choice, absent a showing that the legislature acted arbitrarily or irrationally." *Gronne v. Abrams*, 793 F.2d 74, 77 (2d Cir. 1986). The party challenging the law, therefore, "must disprove every conceivable basis which might support it." *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (citation and internal quotation marks omitted), *aff'd*, 133 S. Ct. 2675 (2013). Friedman argues that the statute's legislative history does not state a rational basis for excluding defamation actions. A legislature, however, "need not actually articulate at any time the purpose or

rationale supporting its classification. . . . Instead, a classification must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320 (citations and internal quotation marks omitted).

Conn. Gen. Stat. § 52-59b was modeled after a nearly identical provision in New York state's long-arm statute. *See* N.Y. C.P.L.R. § 302; *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990). We have previously noted, in the context of the New York statute, that one rational basis for excluding defamation actions against out-of-state defendants is "to avoid unnecessary inhibitions on freedom of speech" and that "[t]hese important civil liberties are entitled to special protections lest procedural burdens shackle them." *Best Van Lines*, 490 F.3d at 245 (quoting *Legros v. Irving*, 38 A.D.2d 53, 55 (N.Y. App. Div. 1st Dep't 1971)); *see also SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n*, 18 N.Y.3d 400, 404 (2012) *(*"Defamation claims are accorded separate treatment to reflect the state's policy of preventing disproportionate restrictions on freedom of expression.").

The New York state exception for defamation actions was initially intended, at least in part, to ensure that "newspapers published in other states [would not be forced] to defend themselves in states where they had no substantial interests." *Best Van Lines*, 490 F.3d at 245 (quoting *Legros*, 38 A.D.2d at 55).

For the first time in his reply brief on appeal, Friedman challenges this rational basis by arguing that "[t]he internet . . . dramatically changes the impact of the long arm defamation exclusion" and "creates a wide defamation liability-free zone for out of state publishers," such as Bloomberg L.P., if they publish defamatory statements online. Appellant's Reply Br. at 25-30. At issue in this appeal, however, is the statute's defamation exception with respect to the individual Milltown and Palladyne Defendants, who are the alleged sources for the challenged statements in the Bloomberg article. As we described earlier, one conceivable basis for affording special protection to out-of-state defendants in defamation actions is to avoid any unnecessary inhibition on their freedom of speech. *See Best Van Lines*, 490 F.3d at 245; *see also* Vincent C.

Alexander, Practice Commentaries, N.Y. C.P.L.R. § 302, at C302:10

(McKinney 2008) ("The [New York State long arm statute's] exclusion

. . . recognizes the ease with which a written or oral utterance may

occur in New York, thereby subjecting numerous individuals . . . to

suit in New York despite their potentially remote connection to the

state."). Because Friedman fails to counter this rational basis, we

conclude that his equal protection argument is unavailing. *See*

*Windsor*, 699 F.3d at 180.

In sum, we agree with the district court that Conn. Gen. Stat. §

52-59b does not violate Friedman's First or Fourteenth Amendment

rights. We therefore affirm the district court's dismissal pursuant to

this statute of Friedman's defamation claim against the Milltown and

Palladyne Defendants for lack of personal jurisdiction.

**II.     The Allegedly Defamatory Statements**

Because the parties do not dispute that we have personal

jurisdiction over the Bloomberg Defendants for their allegedly

defamatory statements, we turn to the district court's dismissal of

Friedman's claim against those defendants for failure to state a claim.

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor. *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

### a. The "For As Much As $500 Million" Statement

We first address the Bloomberg Defendants' argument that the article's statement that Friedman sued Palladyne "for as much as $500 million" is protected under N.Y. Civ. Rights Law § 74. This statute provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights Law § 74. New York courts adopt a "liberal interpretation of the 'fair and true report' standard of . . . § 74 so as to provide broad protection to news accounts of judicial . . . proceedings." *Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233 (N.Y. App. Div. 3d Dep't 1992). A statement is deemed a fair and true report if it is "substantially accurate," that is "if, despite minor inaccuracies, it does not produce a different effect on a reader than

would a report containing the precise truth." *Karades v. Ackerley Grp. Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (citations omitted).

Here, the Bloomberg Defendants' statement that Friedman's suit was "for as much as $500 million" was a fair and true report of a judicial proceeding. The statement was a description of the prayer for relief in Friedman's complaint, which requested that "the Court enter judgment on all Counts for the plaintiff," totaling $499,401,000, exclusive of attorneys' fees and costs. App'x at 89. Nowhere did the complaint state that Friedman was pleading any counts in the alternative or that the damages could not be aggregated. Even though some of these damages would be barred as duplicative if Friedman were successful in his lawsuit, it was not necessary for this explanation to be included in the article. The Bloomberg Defendants' characterization of the damages sought was an accurate description of what was written in the complaint. *See Lacher v. Engel*, 33 A.D.3d 10, 17 (N.Y. App. Div. 1st Dep't 2006) ("Comments that essentially summarize or restate the allegations of a pleading filed in an action . . . fall within § 74's privilege."). As the district court noted, "[t]o the

extent there was an inaccuracy here, it is found in the language [Friedman] used in the prayer for relief." Special App'x at 31.

Friedman argues, however, that the statement was neither fair nor substantially accurate because Bloomberg L.P. did not contact him for a response and, as a sophisticated media company, it should have known that Friedman would not have been able to recover as much as $500 million. Friedman cites no case law in support of his argument that the Bloomberg Defendants were compelled to seek his response in order for an accurate report of the language of his complaint to be "fair." And the outcome that Friedman requests—that we require "sophisticated" reporters to determine the legal question of whether claims asserted in a complaint are duplicative even if they are not pled in the alternative—would be excessively burdensome for the media and would conflict with the general purpose of § 74. *Cf. Becher*, 183 A.D.2d at 234 ("Newspapers cannot be held to a standard of strict accountability for use of legal terms of

art in a way that is not precisely or technically correct by every possible definition." (citation omitted)).[7]

Accordingly, because we find that § 74 applies, we affirm the district court's dismissal of Friedman's defamation claim based on the "as much as $500 million" statement.

### b. The "Repeatedly Tried to Extort" Statement

We next address Palladyne's quote in the Bloomberg article that Friedman "has repeatedly tried to extort money from the company." App'x at 38. Friedman argues that this statement is reasonably susceptible to a defamatory meaning—that he engaged in criminal conduct—and implies the existence of undisclosed facts that are detrimental to his character. We agree that the district court erred in dismissing Friedman's claim based on this statement.

---

[7] Friedman further argues that he is entitled to discovery to determine the source of this statement. However, "once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial provided his or her story is a fair and substantially accurate portrayal of the events in question." *See Cholowsky v. Civiletti*, 69 A.D.3d 110, 115 (N.Y. App. Div. 2d Dep't 2009) (citations and brackets omitted). We therefore find this argument unpersuasive.

Contrary to our view that the "as much as $500 million" statement is protected under New York Civil Rights Law § 74, we conclude that § 74 does not protect Bloomberg against Friedman's claim as to the "repeatedly tried to extort" statement.  Section 74 protects the reporting of a defendant's publicly stated legal position only where the report is "a substantially accurate description of [defendant's] position in the lawsuit." *Hudson v. Goldman Sachs & Co.*, 283 A.D.2d 246, 247 (1st Dep't 2001); *see also Hudson v. Goldman Sachs & Co.*, 304 A.D.2d 315, 316 (1st Dep't 2003) (applying the privilege because defendant ultimately took its publicly stated position in the lawsuit).  This rule aligns with the initial impetus for the privilege, which was so that the public, which "generally may not attend the sittings of the courts, . . . may be kept informed by the press of what goes on in the courts." *Williams v. Williams*, 23 N.Y.2d 592, 597 (N.Y. 1969).

Consequently, even reading the privilege most broadly, the privilege applies here only if Palladyne's contention that Friedman "repeatedly tried to extort" it is a description of a position Palladyne

has asserted or might assert in litigation. But Bloomberg offers no basis on which Palladyne might conceivably rely on Friedman's purported extortion attempts, as represented in the statement, to assert a legal defense against Friedman's claims or to make a counterclaim. This is fatal to Bloomberg's assertion of the § 74 privilege.

Bloomberg, relying on the *Hudson* cases, asserts that a litigant's publicly stated legal position need not be taken in a formal litigation filing for the § 74 privilege to attach to reporting of that stated position. Assuming *arguendo* that Bloomberg's assertion is correct, the § 74 privilege still requires that the published statement be a "substantially accurate report" of the litigation. *Hudson*, 304 A.D.2d at 316; *see also Greenberg v. Spitzer*, 155 A.D.3d 27, 50 (2d Dep't 2017) (reversing trial court's application of the privilege as to statements that "went beyond merely summarizing or restating the . . . proceedings" because, "[w]hen viewed in context, we cannot say, as a matter of law, that the statements provided substantially accurate reporting of the . . . case"). As discussed, Palladyne's accusation of

Friedman's repeated attempts at extortion is not an accurate report of Friedman's lawsuit against Palladyne. Stated differently, by reporting the "repeatedly tried to extort" statement, Bloomberg was in no way informing the public of what was "go[ing] on in the courts." *Williams*, 23 N.Y.2d at 597. The § 74 privilege does not apply.

Having rejected Bloomberg's assertion of privilege, we turn to the merits of Friedman's claim. Under New York law, which the parties do not dispute applies here, a plaintiff must establish the following elements to recover a claim for libel:

> (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability.

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). With respect to the first element of this cause of action, which is the focus of this appeal, we must consider whether (1) "the challenged statements reasonably imply the alleged defamatory meaning" and (2) "if so, whether that defamatory meaning is capable of being proven false." *See Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150-51 (2d Cir. 2000). A defendant is not liable for "statements that

cannot reasonably be interpreted as stating actual facts about an individual, including statements of imaginative expression or rhetorical hyperbole." *Id.* (citation and internal quotation marks omitted).

Here, the district court found that, based on the context in which Palladyne's statement was made, a reasonable reader would understand Palladyne's use of the word "extort" to be "rhetorical hyperbole, a vigorous epithet . . . reflect[ing] Palladyne's belief that an upset former employee had filed a frivolous lawsuit against Palladyne in order to get money." Special App'x at 44. In dismissing Friedman's claim, the district court relied in particular on *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). There, the Supreme Court determined that statements in a newspaper, reporting that attendees of city council meetings had characterized the plaintiff's negotiations with the city as "blackmail," were merely "rhetorical hyperbole" and were not actionable defamatory statements. *Id.* The Court dismissed the defamation claim, concluding that:

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have

understood exactly what was meant: it was [plaintiff's] public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [plaintiff] with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable.

*Id*. (footnote omitted). On appeal, the Bloomberg Defendants also cite to several New York state cases in which courts have held that, in certain contexts, a defendant's use of the term "extort" may be "rhetorical hyperbole" that is not actionable.

In *Melius v. Glacken*, for example, the then-mayor of Freeport stated in a public debate that the plaintiff's lawsuit against him and other officials, alleging that they had conspired to take away the plaintiff's property, was an attempt to "extort money" because the plaintiff was seeking an amount "far in excess of the appraised value" of the property. 94 A.D.3d 959, 959-60 (N.Y. App. Div. 2d Dep't 2012). After the plaintiff sued the mayor for defamation, the court determined that based on the context in which the challenged statements were made—in response to a question about the plaintiff's

lawsuit and in a "heated" public debate—a reasonable listener would have understood that the mayor was stating his opinion about the merits of plaintiff's lawsuit and not accusing the plaintiff of criminal conduct. *Id.* at 960. The court held that the statement was not actionable because the mayor had explained the factual basis for his belief that the plaintiff was attempting to extort money—that the plaintiff sought an amount "far in excess of the appraised value" of the property—and therefore his statement did not imply the existence of undisclosed facts that were detrimental to the plaintiff's character. *Id.* at 960-61; *see also Sabharwal & Finkel, LLC v. Sorrell*, 117 A.D.3d 437, 437-38 (N.Y. App. Div. 1st Dep't 2014) (defendant's statement that plaintiff had broached topic of settlement "to 'extort' money" not actionable because reasonable readers would understand it was an "opinion[] about the merits of the lawsuit and the motivation of [the] attorneys, rather than [a] statement[] of fact"); *G&R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC*, No. 03 CIV.10027 (RWS), 2004 WL 1172762, at *1-2 (S.D.N.Y. May 27, 2004) (defendant's quote in article characterizing plaintiff's lawsuit as "approaching extortion" not

actionable because "no reasonable reader could understand [the] statements as saying that plaintiff committed the criminal act of extortion"); *Trustco Bank of N.Y. v. Capital Newspaper Div. of Hearst Corp.*, 213 A.D.2d 940, 942 (N.Y. App. Div. 3d Dep't 1995) (defendant's use of the word "extortion" to describe lawsuit filed against him not actionable).

Here, the Bloomberg article discussed Friedman's lawsuit and then included the following quote from Palladyne: "These entirely untrue and ludicrous allegations have been made by a former employee who has repeatedly tried to extort money from the company. . . . He worked with us for just two months before being dismissed for gross misconduct." App'x at 38. As in the cases cited by the district court and the Bloomberg Defendants, the article clearly indicated that Palladyne made these statements in the context of a "heated" dispute. *See Melius*, 94 A.D.3d at 959-60. The article described Friedman's allegations that Palladyne was "nothing more than a façade created to conceal criminal transactions" and noted that Friedman alleged that he had been fired by Palladyne with "no legally

cognizable explanation" after voicing his concerns to a colleague about the firm's criminal exposure.  App'x at 37-38.

However, unlike the cases cited by the district court and the Bloomberg Defendants, a reasonable reader could interpret Palladyne's use of the word "extort" here as more than just "rhetorical hyperbole" describing Palladyne's belief that the lawsuit was frivolous.  *See Flamm*, 201 F.3d at 150-51.  Palladyne did not simply state that Friedman's *lawsuit* was an attempt to extort money from the company. Instead, Palladyne stated that Friedman "*repeatedly*" tried to extort money from them.  This statement  can be read as something other than a characterization of Friedman's underlying lawsuit against Palladyne and is reasonably susceptible to a defamatory meaning—that Friedman actually committed the criminal act of extortion—a statement that is capable of being proven false.  *Id.*

This interpretation also is reasonable when the statement is read in the context of Palladyne's entire quote.  After asserting that Friedman had "repeatedly" tried to extort money from them, Palladyne went on to state that Friedman was "dismissed for gross

misconduct." App'x at 38. Palladyne did not explain whether there was a connection between these two statements. A reasonable reader, therefore, could have believed that Friedman's "gross misconduct" consisted of multiple attempts to "extort" money and that Friedman was fired for engaging in this criminal conduct.

Further, even if a reasonable reader could interpret the word "extort" as hyperbolic language describing Friedman's conduct, and not an assertion that Friedman had committed the criminal act of extortion, this statement still would be actionable. A statement of opinion is actionable under New York law if it implies that "the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986); *see also Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977) ("Liability for libel may attach . . . when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader."). Here, Palladyne's statement can be read to imply the existence of

undisclosed facts that would be detrimental to Friedman's character. *See Hotchner*, 551 F.2d at 913. Palladyne indicated that Friedman had taken prior actions that were attempts to "extort" money from the company, but Palladyne did not explain what those prior acts were or provide any details that would shed light on its use of the word "extort," whether outside of the context of Friedman's lawsuit or as a reference to it. *See Melius*, 94 A.D.3d at 961.

The Bloomberg Defendants argue that the article makes clear that Palladyne's statement refers to the fact that Friedman voiced concerns about the firm's criminal exposure and then filed this lawsuit in an attempt to extract money from Palladyne. We disagree that it is clear. Although the article stated that Friedman was fired after "relating his concerns about the firm's criminal exposure to a colleague," App'x at 37, a reasonable inference remains, based on Palladyne's statement that Friedman had "repeatedly" attempted to extort the company, that there were multiple acts that Friedman had taken which rose to the level of "extortion."

Thus, even if Palladyne was asserting an opinion about Friedman's prior conduct, Palladyne's statement can still be read as conveying a negative characterization of Friedman without stating sufficient facts to provide the context for that characterization. Under New York law, such a statement is actionable. *See Hotchner*, 551 F.2d at 913. We therefore reverse the district court's dismissal of Friedman's defamation claim based on this statement.

On remand, it will be up to the jury to decide both (1) whether readers understood Palladyne's statement—"repeatedly tried to extort"—to mean that Friedman engaged in criminal conduct and (2) whether that statement in fact defamed Friedman. *See Sack on Defamation* § 2:4:16 ("Once the judge has determined that the words complained of are capable of a defamatory meaning, that is, are not nondefamatory as a matter of law, it is for the jury to determine whether they were so understood and whether they in fact defamed the plaintiff.") (footnotes omitted)). We express no view as to how those issues should be decided by the fact finder.

**CONCLUSION**

For the reasons stated above, we AFFIRM the district court's dismissal of Friedman's claims against the Milltown and Palladyne Defendants, and AFFIRM in part and REVERSE in part the dismissal of his claims against the Bloomberg Defendants.  We REMAND the case to the district court for further proceedings consistent with this opinion.